UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| **Michael Moran,** * | |
| Plaintiff * | |
| * | Civil No.: _____ |
| **v.** * | |
| * | |
| **Danielle Rylan, NWHL Foundation, Inc.,** * | |
| **NWHL Group, LLC and NWHL Holdings, LLC** * | |
| Defendants * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

Plaintiff, Michael Moran, by and through his attorneys, Cronin, Bisson, & Zalinsky P.C., brings this suit against Defendants, and in support thereof states as follows:

Parties

1. Plaintiff, Michael Moran, is a natural person with a residential address of 470 Commonwealth Avenue PH, Boston, Massachusetts 02215.

2. Defendant, Danielle Rylan, is a natural person with a residential address of 5017 Shorecrest Circle, Tampa, Florida 33609.

3. Defendant, NWHL Foundation, Inc., is registered with the New York Secretary of State as a domestic for-profit corporation with service address of 501 Fifth Avenue, New York, New York 10017. Exhibit 1.

4. Defendant, NWHL Group, LLC, is registered with the New York Secretary of State as a domestic limited liability company with a principal address of 67 West Street Suite 401-B11, Brooklyn, New York 11222-2093. Exhibit 2.

5. Defendant, NWHL Holdings, LLC, is registered with the New York Secretary of State as a domestic limited liability company with a principal address of 67 West Street Suite 401-B11, Brooklyn, New York 11222-2093. Exhibit 3.

6. Defendants own and operate hockey teams, one of which is "Boston Pride," situated in Boston Massachusetts area, playing home games at the Edge Sports Center in Bedford Massachusetts, the Harvard Bright-Landry Center in Boston, Massachusetts, and the Raymond Bourque Arena in Beverly, Massachusetts.

## Jurisdiction and Venue

7. The parties are diverse, and the amount in controversy is greater than $75,000, giving this Court jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

8. Because the Defendants own and operate a hockey team situated in the Boston area and themselves have with minimum contacts with the Boston Massachusetts area, it should have been reasonably foreseeable to them that they may be hauled into court in Massachusetts. *See Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 317 (1945) ("Presence in the state . . . [exists] when the activities of the corporation there have not only been continuous and systematic, but also give rise to the liabilities sued on, even though no consent to be sued or authorization to an agent to accept service of process has been given.")

9. Additionally, Defendant Rylan, as representative of Defendants, regularly attends league-related events in the Boston area and conducts league-related business in Massachusetts, subjecting herself to the jurisdiction of this state. *Id.*

## Facts

10. Rylan and Moran had a friendship that goes back several years.

11. The pair discussed the foundation of a women's hockey league in 2013.

12. Rylan was working for the NHL Network and attempting to launch a coffee shop at that time.

13. Rylan believed that the league would provide female athletes more opportunities for playing hockey after college, and no one had started a United States based league.

14. Moran and Rylan agreed they would engage in this endeavor together, with Moran providing some seed money.

15. Also, the fledgling league had certain start-up costs that Rylan could not afford to pay for out of her own pocket.

16. Accordingly, the pair agreed that Moran would pay mostly fixed, regularly occurring sums to Rylan as an investment in the league.

17. Initially, the pair agreed that these sums would be considered an investment in the league, which Rylan and Moran would each control and from which each might someday profit, as co-owners.

18. Rylan accepted payments for roughly two years and devoted much of her time to the league's formation.

19. Beginning around February 2015, Moran also started working full time as the league's Chief Marketing Officer.

20. Then, the league was launched in April 2015.

21. At that time, Moran and Rylan agreed their share of the profits of the league would be 40/60, respectively.

22. None of these agreements were put in writing because Moran and Rylan were friends and had been friends for years.

23. Moran made payments to Rylan and to the league, knowing that Rylan was directing these sums where they were needed, regardless of how they were received.

24. These purposes included paying vendors and players and repaying debts incurred by the league. Exhibit 4.

25. Moran also made direct payments to third party vendors on behalf of the league.

26. These payments included sums sent to marketing companies, web hosting services, advertising services, including Facebook, and sums paid related to events that the league hosted for promotions and fundraising.

27. Moran assisted in the launch of the league with publicity, party planning, advertising, and other logistics.

28. Moran was not compensated for the labor he expended for the league but Rylan was.

29. Thereafter, following launch of the league, Moran continued making payments directly to Rylan or to the league's foundation as a means of providing funds to be used for league purposes.

30. In total, Moran provided more than $200,000 in financial support to launch the league.

31. Shortly after Moran and Rylan agreed that their shares in the league would be 40/60, respectively, Rylan sent an email to another individual affiliated with the league, indicating that Moran was only allocated a 2 percent share.

32. Moran learned of this email, which Rylan did not intend Moran to see, and the pair's friendship soured.

33. The first pay cycle came in October 2015, when the league was to pay its players.

34. On the eve of that deadline, Rylan, the league's self-appointed commissioner, had no plan for payment.

35. Rylan, Moran, and other officers, investors, and friends of the league cobbled together enough money to be able to pay players their first paychecks.

36. However, after seeing how poorly organized the league was and after the deterioration of the relationship between Moran and Rylan, Moran and Rylan agreed Moran's involvement with the league should be severed.

37. Specifically, Rylan agreed Moran would terminate his involvement as an investor, and Rylan would cause his financial investments to be treated as loans and returned to him.

38. Rather than deny that Moran had lent sums to the league to assist in its formation, Rylan, the league's counsel, Ben Natter and its Chief of Operations at the time, George Speirs, attempted to negotiate a repayment plan.

39. However, the league was not keen on paying Moran the full sum he had lent to allow the league to be founded.

40. Additionally, George Speirs, who had been finalizing details of repayment with Moran, was terminated in early February 2016.

41. Thereafter, communication between the league and Moran regarding repayment ceased.[1]

42. As such, the parties could not coordinate mutually agreeable repayment terms.

43. This action has therefore become necessary.

---

[1] On February 29, 2016 the league sought to have Moran transfer control of the league website. When Moran did not immediately respond, on March 15, 2016, George Speirs' login was used to attempt to access the league website to retake control. This effort came from an internet protocol ("IP") address at the league office, was done without Moran's assent or knowledge, and it was done after Speirs had left the league's employment. Additionally, the league requested access to the website that Moran had caused to be created and paid for, despite that it had not upheld its end of the bargain with Moran to pay his loan to the league.

### Count I – Breach of Contract (all Defendants)

44. The Plaintiff re-alleges and incorporates herein the allegations set forth above.

45. Moran and Rylan, acting on behalf of each of the Defendants, entered into a valid contact because all of the essential elements of a contract were satisfied: offer, acceptance, consideration, and a meeting of the minds. *Situation Mgmt. Sys. v. Malouf, Inc.*, 724 N.E.2d 699, 703 (Mass. 2000).

46. Initially, Moran agreed to invest sums with the league as a co-founder and co-owner of the league.

47. When that relationship soured, Moran requested that he be repaid the sums he lent as a loan instead of continuing his involvement as an investor.

48. The league, through Rylan, agreed.

49. Nonetheless, Defendants have breached this agreement by failing to pay the balance due to Moran for loans expended to the league.

### Count II – Partnership Dissolution and Accounting (Rylan)

50. The Plaintiff re-alleges and incorporates herein the allegations set forth above.

51. When individuals associate for the purpose of sharing profits and control, there is a presumption the agreement they have made is in the nature of a partnership. MASS. GEN. LAWS ch. 108A, § 6; *see Shain Inv. Co. v. Cohen*, 443 N.E.2d 126, 130 (Mass. App. Ct. 1982).

52. In this case, the agreement originally reached between Moran and Rylan was that they would share profits, losses, and control in a 40/60 ratio, respectfully.

53. Therefore, if the Court finds that no contract was reached to treat Moran's investment as a loan, then Moran owned 40 percent of the league and had a proportionate controlling interest.

54. To the extent Rylan assigned Moran some other ownership interest without his knowledge when the league was incorporated, that assignment constituted a breach of Rylan's fiduciary duty to her co-partner and fraud in the inducement, causing Moran to enter into the partnership wrongfully. *See Meehan v. Shaughnessy*, 535 N.E.2d 1255, 1263 (Mass. 1989) (discussing duties of good faith and loyalty); MASS. GEN. LAWS ch. 108A, § 39.

55. From the first discussion of the formation of the league, Moran and Rylan agreed that the two of them would share in ownership and control of the league.

56. Nonetheless, Rylan assigned to others interest in the league that belonged to Moran and attempted to hide that assignment from Moran all while inviting and encouraging his continued participation in the league, including representing to others that he was the marketing officer for the league.

57. Moran is therefore entitled to rescind the partnership, to receive a return of his investment, and to be indemnified by the defrauding partner: Danielle Rylan. *Madigan v. McCann*, 190 N.E.2d 215, 217 (Mass. 1963); Mass. Gen. Laws ch. 108A § 39.

58. In winding up the partnership, Moran is also entitled to an accounting. MASS. GEN. LAWS ch. 108A, §§ 21; 22(a).

### Count III – MASS. GEN. LAWS ch. 93A (all Defendants)

59. The Plaintiff re-alleges and incorporates herein the allegations set forth above.

60. The contractual violations and misrepresentations discussed above constitute unfair and deceptive business practices pursuant to Mass. Gen. Laws chapter 93A.

61. To prevail on a 93A claim, the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce. *Levings v. Forbes & Wallace, Inc.*, 396 N.E.2d 149, 153 (Mass. App. Ct. 1979).

62. Defrauding a partner into continued financial support while intentionally misrepresenting the ownership and control interest being provided to that partner certainly constitutes an unfair and deceptive trade practice.

63. Likewise, agreeing to treat an investor's contribution as a loan in exchange for their agreeing to terminate involvement in the business and then refusing to repay the loan also constitutes a deceptive trade practice.

64. Moran seeks treble damages and attorney's fees associated with this action pursuant to chapter 93A.

### Count IV – Quantum Meruit (all Defendants)

65. The Plaintiff re-alleges and incorporates herein the allegations set forth above.

66. Even if the Court does not find that the Moran had an enforceable contract with Defendants, Moran is entitled to obtain the value of the services provided, for which he has not been paid.

67. Quantum meruit refers to contracts implied in fact or to obligations imposed by law without regard to the intention or assent of the parties bound, for reasons dictated by reason and justice.

68. "To achieve recovery upon the theory of quantum meruit, the claimant must prove (1) that it conferred a measurable benefit upon the defendants; (2) that the claimant reasonably expected compensation from the defendants; and (3) that the defendants accepted the benefit with the knowledge, actual or chargeable, of the claimant's reasonable expectation." *Finard & Co., LLC v. Sitt Asset Mgmt.*, 945 N.E.2d 404, 407–08, (Mass. App. Ct. 2011).

69. Moran served as the league's Chief Marketing Officer full time for eight months, from February to October 2015.

70. In this role, he primarily engaged in advertising on behalf of the league, but he also ensured a robust web presence, contracting and paying for web hosting and other digital marketing services.

71. At the time, Moran's expectation was that he would be paid out of the future earnings of the league.

72. However, Moran's involvement with the league has ended, and he has agreed not to receive any future earnings from it.

73. In exchange and in addition to repaying sums lend to found the league, Moran must be paid the value of the services he provided the league.

74. The league was aware Moran expected reimbursement in some form, and it has benefitted from eight months of Moran's skilled marketing efforts.

75. Thus, he is entitled to be reimbursed for the reasonable cost of his labor.

76. Upon information and belief, the other league executives receive compensation ranging from $80,000 to $90,000 in the form of an annual salary.

77. Thus, Moran should be reimbursed for eight months at the minimum salary range of $80,000 per year, which is roughly $50,000, minus appropriate withholdings.

### Count V – Restitution (all Defendants)

78. The Plaintiff re-alleges and incorporates herein the allegations set forth above.

79. As an alternative to breach of contract, partnership, 93A, Moran conferred a benefit upon Defendants by paying debts on their behalf, lending money for them to pay their own debts and for other services, and it would be unjust for Defendants to retain that benefit.

80. Defendants must make restitution of sums Moran lent to them.

81. "Restitution is not damages; restitution is a restoration required to prevent unjust enrichment. The fundamental substantive basis for restitution is that the defendant has been unjustly enriched by receiving something, tangible or intangible, that properly belongs to the plaintiff. Restitution rectifies unjust enrichment by forcing restoration to the plaintiff." *Santagate v. Tower*, 833 N.E.2d 171, 180 (Mass. App. Ct. 2005) (quoting 1 DOBBS, LAW OF REMEDIES § 4.1(1), at 557 (2d ed. 1993)).

82. In this case, Moran made payments to found a professional women's hockey league because he believes in what it can be.

83. Initially, Moran accepted that he would be an investor and see a return on sums paid at some point in the distant future.

84. As the league was launched, however, it rapidly became apparent that not all others involved in leadership of the league had responsible visions for how to manage the finances of the league.

85. At that time, there was an agreement for Moran's investments to instead be treated as a loan and to be repaid.

86. With that decision, Moran's involvement in the decision making for the league would also end.

87. Since Moran agreeing to cease his involvement and actually ceasing his involvement with the league, however, the league has failed and refused to return sums lent to it initially.

88. It is unjust for the league to retain sums lent to it while refusing to reimburse the lender.

89. Plaintiff requests trial by jury on all claims.

**WHEREFORE**, the Plaintiff respectfully requests this Honorable Court:

A. Award the Plaintiff reimbursement of sums lent to Defendants;

B. Find Plaintiff is a partner in the league and order an accounting;

C. Award the Plaintiff sums he should have been paid his efforts as Chief Marketing Officer;

D. Order Defendants to reimburse Plaintiff for sums paid to them or on their behalf;

E. Award Plaintiff his attorney's fees and costs associated with bringing this action and treble damages; and

F. Grant such other relief as it may deem just and proper.

Respectfully submitted,

MICHAEL MORAN

By and through its attorneys,
CRONIN, BISSON & ZALINSKY P.C.

Dated:  April 27, 2016          /s/ John G. Cronin
                                John G. Cronin, Esquire (MA BBO #629011)
                                722 Chestnut Street
                                Manchester, New Hampshire 03104
                                (603) 624-4333